IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JUL 2 4 2019

UNITED STATES OF AMERICA,

v.

UWEM NSE OBONG,
(a/k/a UWEMEDIMO NSE OBONG),
(a/k/a ERNEST OBONG),

        Defendant.

Case No. 1:19CR 33 /

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT AND ARREST WARRANT

I, Michael Major, being first duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of a criminal complaint and arrest warrant for

UWEM NSE OBONG, a/k/a UWEMEDIMO NSE OBONG, a/k/a ERNEST OBONG

("OBONG").

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been

employed as such since September 2004. Since graduating from the FBI Academy at Quantico,

Virginia, I have investigated a variety of criminal matters including organized criminal enterprises,

financial institution fraud, investment fraud, and public corruption. I have served as a Supervisory

Special Agent in both the Counterterrorism and Criminal Investigative Divisions at FBI

Headquarters. In January 2016, I began my current assignment investigating corporate fraud in the

Washington, D.C. Division. Prior to becoming a Special Agent, I worked as a Certified Public

Accountant for a public accounting firm. Through my employment with the FBI, I have gained

knowledge in the use of various investigative techniques including the utilization of physical

surveillance, investigative interviews, financial investigations, the service of Administrative and Grand Jury Subpoenas, and the execution of search and arrest warrants. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1).

3.     I am familiar with the information contained in this Affidavit. This Affidavit is based upon information from several sources, including my personal observations, information provided to me by other law enforcement agents and officers, documents and financial records provided by different entities and individuals, and publicly available information. This Affidavit is offered for the sole purpose of establishing probable cause in support of a criminal complaint against OBONG and does not set forth all of the facts of this investigation.

4.     Based on my training and experience and the facts as set forth in this Affidavit, I submit that there is probable cause to believe that starting in and around November 2015, OBONG committed wire fraud, in violation of 18 U.S.C. § 1343, in the Eastern District of Virginia and elsewhere, as well as the other subject offenses set forth below.

THE SUBJECT OFFENSES

5.     *Wire Fraud.* Title 18, United States Code, Section 1343 provides in relevant part that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice…" shall be guilty of a federal offense.

2

6.     *Bank Fraud.*  Title 18, United States Code, Section 1344 provides in relevant part that "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises…" shall be guilty of a federal offense.

7.     *Financial Aid Fraud.*  Title 20, United States Code, Section 1097(a) provides in relevant part that "[a]ny person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement, or forgery, or fails to refund any funds, assets, or property provided or insured under this subchapter or attempts to so embezzle, misapply, steal, obtain by fraud, false statement or forgery, or fail to refund any funds, assets, or property…" shall be guilty of a federal offense.

8.     *Aggravated Identity Theft.*  Title 18, United States Code, Section 1028A provides in relevant part, "[w]hoever, during and in relation to any felony violation [including those related to mail, bank and wire fraud] knowingly transfers, possesses or uses, without lawful authority, a means of identification of another person . . ." shall be guilty of a federal offense.

PROGRAM DESCRIPTION

9.     The FBI and the United States Department of Education Office of the Inspector General (ED-OIG) are jointly conducting this criminal investigation.  Through my interaction with a Special Agent from ED-OIG, I am aware of the following:

10.     The Department of Education is an executive department of the United States Government with the primary responsibility of administering various educational financial assistance programs throughout the United States, including those authorized by Title 20, Chapter 28, Subchapter IV of the United States Code, and applicable federal regulations pertaining to

3

student financial assistance (collectively referred to herein as "federal student aid").

11.    Among the educational financial assistance programs administered by the Department of Education are federally guaranteed student loan programs that require repayment of the educational loans awarded.

12.    In order to participate in the federal educational financial assistance programs, or a state sponsored educational assistance program, a student is required to complete a Free Application for Federal Student Aid ("FAFSA"). The FAFSA requires, among other information, the student's name, date of birth, social security number, and adjusted gross income from the previous tax year. The FAFSA requires the identification and signature of the preparer of the form. The FAFSA also requires the student or preparer to certify that the information being supplied is true and correct. The FAFSA contains written notice that a false statement or misrepresentation on the application is punishable as a crime.

13.    The completed FAFSAs are processed by a Department of Education contractor, which then forwards an email to the email address supplied by a student-applicant when completing a FAFSA. Within the email is a link to a report called a Student Aid Report ("SAR").

14.    The Department of Education contractor also sends a student-applicant's Institutional Student Information Record ("ISIR") electronically to the schools listed by the student on the FAFSA. The school then uses the information to determine the type and amount of federal and state student financial aid for which the student qualified. The school then certifies the student's eligibility, enrollment status, recommended loan amounts, and other information.

15.    Depending on the type of federal student financial aid for which the applicant applied and qualified for, funds are disbursed as follows:

        a.  Funds from grants, including Pell Grants, are transferred via wire from the United

4

States Treasury through the Federal Reserve System to the school's federal funds receiving bank account, where the money is then transferred into its operating account to cover the student's outstanding tuition bills and other school fees.

b.   Funds from guaranteed student loan programs utilize private loan capital supplied primarily by commercial lenders.  The loans are guaranteed by state agencies or private, non-profit agencies ("Guarantee Agency"), and are reinsured by the Federal Government.  In addition to the other application requirements set forth above, in order to obtain guarantees student loan funds, the student executed a Master Promissory Note ("MPN").  The MPN obligates the student to repay the loan.  The execution of the MPN is generally done by accessing the Guarantee Agency's online system to create, sign, and certify an MPN.  Loan funds can then be obtained from a qualified lender.  The lending institution issues a check or executes a wire transfer of funds, less origination and guarantee fees, to the school's operating account.  The loan funds are then used by the school to cover the student's outstanding tuition bills and other school fees.

c.   In both grant and guaranteed loan programs, funds in excess of the required school expenses are forwarded to the student to be used for other authorized education related expenses including, books, supplies, housing, and subsistence through a direct deposit or a check, known as a "refund check."  This refund check, or refund, is either mailed directly to the student's address of record, picked up in person, or direct deposited into an account specified by the student.

16.   If the Guarantee Agency guaranteed the loan, a notice of guarantee or disclosure statement is sent to the student.  If the student is not admitted or enrolled into the school, the funds

are returned to the lender and the loan is canceled.

17.     If a student defaulted on a loan and the bank could not collect, the Guarantee
Agency assumed responsibility for service of the loan, and, in some cases, collection of the loan. If
the Guarantee Agency is unable to collect on the loan, the U.S. Department of Education
reimburses the Guarantee Agency for the principal of the loan, interest, special allowances, and
collection fees.

BACKGROUND AND JURISDICTION

18.     As detailed below, there exists probable cause to believe OBONG engaged in a
criminal scheme through which he obtained and used the personally identifiable information (PII)
of real individuals, used this PII to enroll these unwitting individuals as students at Strayer
University without their knowledge or consent, fraudulently applied for and obtained student loans
in the names of real individuals, directed that refunds be deposited into bank accounts he controlled
and obtained and converted a portion of the proceeds of the fraudulently obtained student loans to
his own use. Strayer University officials identified the scheme and alerted the Fairfax County,
Virginia Police Department (FCPD) to OBONG's activities in approximately September 2016.
The FCPD subsequently referred the matter to the FBI, and the FBI began a joint investigation with
ED-OIG soon thereafter.

19.     Currently, the FBI and ED-OIG have determined that OBONG used the identities of
approximately 37 real individuals to enroll in a number of universities, including Strayer
University, without their knowledge and consent, in order to fraudulently apply for and obtain
student loans in their names so that he could unlawfully obtain refunds. As a result of this scheme,
OBONG knowingly and intentionally caused the disbursement of at least approximately $60,000
worth of fraudulently obtained student loans to Strayer University and other universities in order to

6

obtain refunds in the names of the victim enrollees.

20.     Strayer University is a private, for-profit accredited university that offers undergraduate and graduate programs at approximately 76 physical campuses as well as a degree program for online-only students.  Strayer University headquarters are in Herndon, Virginia, within the Eastern District of Virginia.

PROBABLE CAUSE

*Strayer University Information*

21.     The FBI interviewed T.S., Director of Fraud Prevention for Strayer University (hereinafter "Strayer"), in September 2016.  According to T.S., Strayer's financial aid system is not credit based, thus making every student eligible to receive financial aid.  In the case of a typical financial aid recipient, prior to the class term beginning, a student must fill out, certify and submit electronically the FAFSA, used to determine the amount of financial aid they are eligible to receive.

22.     I have been advised by law enforcement officials with ED-OIG that every time an applicant enters their unique FAFSA pin number or PII in an attempt to access their FAFSA from the FAFSA website, the event is logged along with the associated IP address.

23.     As set forth above, the completed FAFSA's are processed by a contractor for the Department of Education and each school uses information provided by the student-applicant on the FAFSA to determine the type and amount of federal and state student financial aid for which the student qualified.  After certifying the student's eligibility for financial aid, enrollment status, recommended loan amounts and other information, the financial aid funds are disbursed, as set forth above.  After Strayer receives the funds from the United States Treasury, or a qualified commercial lender under a guaranteed student loan program, Strayer applies the appropriate

portion of the funds to the student's tuition and any other school fees. A third-party processor then electronically distributes any excess loan balance to the student via direct deposit into the student's designated bank account or by check sent via U.S. mail.

24.     The FBI also interviewed L.Z., Senior Vice President and General Counsel for Strayer, in September 2016. According to L.Z., an individual (hereinafter referred to as "Individual One") contacted Strayer in January 2016 to report that he had discovered approximately $13,000 in student loans had been obtained in his name related to his enrollment at Strayer. Individual One informed Strayer that he had never attended the school. Strayer used its information technology (IT) resources to identify the internet protocol (IP) address used to obtain a student loan in the name of Individual One (IP address 73.133.40.73). Further investigation revealed that this same IP address was used also to enroll over thirty separate individual names as students at Strayer. Per Strayer, all of these names belonged to actual individuals but were believed to be fraudulent enrollees. Moreover, Strayer's investigation revealed that federal financial aid had, in fact, been disbursed to several of these fraudulent enrollees in the form of student loans[1]. Per Strayer, all of these fraudulently obtained student loan disbursements were sent to the same BankMobile account ending in the digits "1683," and all loan disbursements were associated with the same IP address (73.133.40.73). FBI and ED-OIG investigation revealed this IP address was associated with OBONG's residential address (OBONG resided with his parents in Bowie, Maryland), and the BankMobile account in question was held in OBONG's name.

---

[1] My review of financial documents confirms OBONG fraudulently obtained refunds from student loans obtained in the names of four real individuals, described in this Affidavit as Victim 1, Victim 3, Victim 4 and Victim 5, which were deposited into OBONG's bank account. Records reveal that OBONG applied for a student loan using the PII of Victim 2. However, I have been unable to confirm whether or not OBONG received any funds in the name of Victim 2.

25.     This investigation identified multiple real people whose PII had been used without their knowledge and consent to register them as students at Strayer and obtain federal student loans in their names.  I hereinafter refer to five such unwitting Strayer enrollees as Victim 1, Victim 2, Victim 3, Victim 4, and Victim 5.

*Financial Information*

26.     I reviewed records from BankMobile for the bank account number ending in 1683, which is an account held by "Uwem OBONG," for the period of approximately October 2014 through March 2016.  My review of OBONG's BankMobile account statements revealed the following deposits associated with Victim 1, Victim 3, Victim 4, and Victim 5:

   a.  A November 23, 2015, deposit for $1,825, bearing the description "REFUNDSELECT AR REFUNDS [Victim 5[2]]";

   b.  A December 1, 2015, deposit for $836.00, bearing the description "REFUNDSELECT AR REFUNDS [Victim 5]";

   c.  A December 9, 2015, deposit for $4,161.00, bearing the description "REFUNDSELECT AR REFUNDS [Victim 3]";

   d.  A December 23, 2015, deposit for $4,161.00, bearing the description "REFUNDSELECT AR REFUNDS [Victim 1];

   e.  A December 23, 2015, deposit for $1,825.00, bearing the description "REFUNDSELECT AR REFUNDS [Victim 4];

   f.  A December 30, 2015, deposit for $836.00 bearing the description "REFUNDSELECT AR REFUNDS [Victim 4]";

   g.  A January 22, 2016, deposit for $2,703.00 bearing the description "REFUNDSELECT AR REFUNDS [Victim 5]";

   h.  A January 22, 2016, deposit for $4,246.00 bearing the description "REFUNDSELECT AR REFUNDS [Victim 1]";

---

[2] The deposit descriptions on the bank account statements list the actual victim/witness names.  I have redacted the victim/witness names for the purpose of this affidavit.

     i.   A January 22, 2016, deposit for $4,247.00 bearing the description "REFUNDSELECT AR REFUNDS [Victim 3]"; and

     j.   A January 26, 2016, deposit for $2,703.00 bearing the description "REFUNDSELECT AR REFUNDS [Victim 4]."

27.    My review of OBONG's bank account statements further indicates the above-listed funds were often withdrawn from OBONG's BankMobile account shortly after their receipt at various locations in Maryland and Washington, DC.  For example, on December 9, 2015 (the date of deposit "C" in the above list), OBONG's account statement reflects a $503.00 debit associated with BB&T bank in Lanham, Maryland.  A second debit, also for $503.00, occurred on the same day and is associated with TD Bank in Washington, DC.

28.    BankMobile records for OBONG's account, which list OBONG's residence as the home address, also included an "activity log" with dates and times of account logins, and the IP address associated with each login.  My review of the activity log for OBONG's bank account indicated multiple, successful "web user" logins (which I believe to represent successful online banking logins) on at least five separate dates from IP address 73.133.40.73, which, as described below, was assigned to a Comcast account at OBONG's residence.  The dates of some of these logins coincide with the same exact dates as the deposits made into OBONG'S BankMobile account for refunds associated with the following four fraudulent Strayer enrollees:  Victim 5 (November 23, 2015 and December 1, 2015); Victim 3 (December 9, 2015); Victim 1 (December 23, 2015) and Victim 4 (December 23, 2015 and December 30, 2015).

29.    On or about May 2, 2018, ED-OIG obtained and reviewed materials from Comcast for subscriber records pertaining to IP address 73.133.40.73.  Comcast subscriber information for this IP address reveals that "Nse OBONG" maintains an active account for "High Speed Internet Service" at OBONG's residence (account number ending in 5143).  Based on the information set

forth throughout this affidavit, there is probable cause to believe that the IP address (73.133.40.73) used to fraudulently enroll students and obtain financial aid is associated with both OBONG and his residence.

30.     Law enforcement has collected the IP addresses associated with the various electronic documents submitted to the Department of Education,[3] including FAFSAs and Master Promissory Notes (MPN), in the names of Victim 1, Victim 2, Victim 3, Victim 4, and Victim 5. The table below captures a sampling of electronic submissions that came from OBONG's residence based on the Comcast records for the listed IP address.

| Identity | Document | IP Address | Date and Time |
|----------|----------|------------|---------------|
| Victim 1 | MPN | 73.133.40.73 | 9/29/2015 at 05:17:10 |
| Victim 4 | MPN | 73.133.40.73 | 7/6/2016 at 06:34:55 |
| OBONG | FAFSA | 73.133.40.73 | 11/6/2017 at 17:47:22 |
| Victim 3 | MPN | 73.133.40.73 | 11/19/2017 at 18:28:30 |
| Victim 2 | MPN | 73.133.40.73 | 11/22/2017 at 21:23:58 |
| Victim 5 | MPN | 73.133.40.73 | 12/1/2017 at 18:21:57 |
| Victim 2 | FAFSA | 73.133.40.73 | 1/8/2018 at 18:12:24 |
| Victim 1 | FAFSA | 73.133.40.73 | 2/4/2018 at 10:49:36 |
| Victim 5 | FAFSA | 73.133.40.73 | 2/4/2018 at 11:21:29 |
| Victim 3 | FAFSA | 73.133.40.73 | 2/8/2018 at 12:52:12 |
| Victim 3 | FAFSA | 73.133.40.73 | 7/8/2018 at 19:03:17 |
| Victim 2 | FAFSA | 73.133.40.73 | 7/8/2018 at 19:21:34 |

---

[3] The submission of FAFSAs or MPNs from the Subject Location were initially sent to United States Department of Education computer servers in Texas.  A submitted FAFSA will cause additional interstate wire transmissions if, as is the case here, it identifies a school outside Texas.

| Victim 5 | FAFSA | 73.133.40.73 | 7/8/2018 at 19:27:20 |
|---|---|---|---|

31.     According to Department of Education records, from July 25, 2015 to July 9, 2018, there were approximately 37 different user names associated with IP address 73.133.40.73, including Victim 1, Victim 2, Victim 3, Victim 4, and Victim 5.   During this time, this same IP address accessed, or attempted to access, FAFSAs via the website approximately 260 times, including those associated with Victim 1, Victim 2, Victim 3, Victim 4, and Victim 5.

32.     On August 10, 2016, OBONG was found guilty on two counts of simple assault in Superior Court of the District of Columbia and began a 270-day term of incarceration, with a release date of May 4, 2017.  According to Department of Education records, there were consistent FAFSA submissions from the IP address 73.133.40.73 both prior to and after OBONG's term of incarceration, but not _during_ the term of incarceration.  Submissions originated from the IP address 73.133.40.73 until July 3, 2016 (approximately one month prior to the term of incarceration) and there were no further FAFSA submissions from that IP address until November 6, 2017, approximately six months after the term of incarceration ended.  The first post-incarceration FAFSA submissions from this IP address on November 6, 2017 were in the name "Uwem OBONG" and subsequently "Uwemedimo OBONG."  The IP address is thus associated not only with FAFSA accesses and/or submissions for known identity theft victims, but also with FAFSA access in OBONG's true name.  FAFSA account access analysis, coupled with OBONG's known period of incarceration, then, suggest OBONG fraudulently accessed fraudulent FAFSA accounts from an IP address linked to his residence as recently as July 2018.

_Victim/Witness Interviews_

33.     In 2017, the FBI interviewed Victim 1, who lives in New York.  Victim 1 told the FBI he noticed approximately $30,000 in student loans for Strayer when reviewing his credit

reports. Victim 1 explained he has never been a student at Strayer and did not apply for the loans. Victim 1 recalled the address associated with the Strayer loans was in either Maryland or Virginia, though Victim 1 has never lived in either state. Victim 1 reported the fraudulent loans to both Strayer and to his local police department. Victim 1 has never heard of OBONG.

34.     Victim 2, who lives in Florida, told the FBI he was a victim of identity theft and that all his personal information had been compromised. Victim 2 stated that he had incurred a small student debt but that he paid it off in the 1980's. Victim 2 stated that he never attended, enrolled with, or had any affiliation with Strayer or any other online universities. Victim 2 stated that he does not know OBONG.

35.     Victim 3, who lives in California, told the FBI he had experienced numerous instances of identity theft. Victim 3 stated that he never applied for any student loans and is not familiar with the FAFSA. Victim 3 indicated that he had never heard of or been involved with Strayer, had never heard of OBONG.

36.     Victim 4, who lives in Pennsylvania, told the FBI he had been the victim of identity theft. After he started noticing unauthorized inquiries on his credit report, Victim 4's bank told him all his personal identifying information had likely been compromised. Victim 4 revealed that he previously held student loans pursuant to his education at a California State University campus, but he paid them off in the 1990's. Victim 4 indicated that he had no connection to either Strayer or OBONG.

37.     Victim 5, who lives in California, told the FBI he obtained student loans to attend a university in Indiana, which he paid off in 1979. Victim 5 stated that he had not applied for or obtained any student loans since then. Representatives from Strayer called Victim 5 to advise him a fraudulent student loan had been taken out in his name, and that he would not be responsible for the loan. Victim 5 stated that he had never heard of OBONG.

*Search Warrant Conducted at OBONG's residence in Bowie, Maryland*

38.     Based in part on probable cause outlined in this Affidavit, on September 14, 2018, the Honorable Thomas M. DiGirolamo, United States Magistrate Judge, District of Maryland, authorized a Search and Seizure warrant for OBONG's residence in Bowie, Maryland.  FBI and ED-OIG personnel served the warrant and conducted a search on September 25, 2018.  OBONG was present at the residence at the time of the search, and agreed to an interview with ED-OIG agents.  A summary of OBONG's interview is included in the next section of this Affidavit.

39.     The FBI seized fruits, evidence, and instrumentalities of the Subject Offenses during the September 2018 search of OBONG's residence.  The items were seized from an upstairs bedroom, which OBONG's mother confirmed was OBONG's room.  Some seized items were in physical (paper) form, while others were discovered in electronic form on various digital media seized from OBONG's bedroom.  Items seized from OBONG's room include, but are not limited to, the following:

    a.  Extensive pages of hand-written notes containing the names, birthdays, social security account numbers, addresses, and other PII for numerous individuals.  These pages sometimes include what appear to be email addresses, telephone numbers, login names and passwords, and schooling information.

    b.  Various identifying documentation, including social security cards, government identification cards, and birth certificates, for multiple individuals which appear to be fraudulent.

    c.  Academic transcripts for multiple individuals from various colleges or universities.

    d.  Financial aid applications and other student aid documentation, sometimes filled out in the names of various individuals.

e.  Banking information, such as checking/debit card applications, filled out in the names of numerous individuals.

f.  Items specifically related to the aforementioned Victims in this investigation, previously identified in this Affidavit as Victim 1, Victim 2, Victim 3, Victim 4, and Victim 5, such as:

  i.  Items bearing Victim 1's identifying information, including, but not limited to:

    1.  Hand-written notes containing PII for Victim 1;

    2.  A University of Kansas academic transcript; and

    3.  A "Government ID Card."

  ii.  Items bearing Victim 2's identifying information including but not limited to:

    1.  Hand-written notes containing PII for Victim 2;

    2.  A Cedar Valley College student academic transcript; and

    3.  A Strayer University Student Financial Services "Award Adjustment Request" dated June 24, 2016.

  iii.  Items bearing Victim 3's identifying information including but not limited to:

    1.  Hand-written notes containing PII for Victim 3;

    2.  An Alma College university transcript; and

    3.  A "Government ID Card."

  iv.  Items bearing Victim 4's identifying information include, but are not limited to:

    1.  Hand-written notes containing PII for Victim 4; and

        2.  A California State University, Fullerton academic transcript.

    v.  Items bearing Victim 5's identifying information including but not limited to:

        1.  Hand-written notes containing PII for Victim 5;

        2.  A University of Notre Dame official academic transcript; and

        3.  A "Government ID Card."

*Non-Custodial and Consensual Interview of OBONG*

40.     After being advised during the search warrant that no one in the OBONG residence was under arrest and that they were all free to leave, OBONG agreed to be interviewed and answer questions from investigators. ED-OIG Special Agents interviewed OBONG in a spare bedroom adjacent to his room. After providing his date of birth and other personally identifying information, OBONG affirmed that he lived in the residence with his parents and had done so for the past seven years. OBONG said he was currently unemployed and provided his educational history. Initially, OBONG said he attended Morgan State University, from which he was expelled after a confrontation with university advisors, and the University of Maryland-Eastern Shore but that he did not graduate from either one. OBONG said that he believed he received financial aid refund checks from both of these schools.

41.     An ED-OIG Special Agent showed OBONG an "Enrollment Summary" report showing a total of 11 universities that OBONG had enrolled in, including Strayer University, and asked OBONG to confirm which schools he attended. OBONG checked all 11 universities and claimed he intended to graduate from all schools and did not simply enroll to receive financial aid refunds. OBONG acknowledged that he was not currently enrolled in any school but intended to return at some point to obtain a degree. OBONG further stated that he had been "dismissed" from

some schools because of his previous expulsion from Morgan State because he had failed to report the expulsion on various school applications.

42.     When asked if he had ever been asked to enroll someone else in college or university, he replied in the negative and affirmatively stated he had never enrolled someone else in a college or university.  After the interviewing agent admonished OBONG about the importance of providing truthful information, OBONG recanted his prior statement and divulged that he "may have" enrolled three identities at Strayer University, other than himself.  Upon being advised by the agent that the actual number was more than 30 students, OBONG replied "that is false."  OBONG estimated he received two or three financial aid refunds on behalf of other identities he had enrolled at Strayer, totaling approximately $2,500.  OBONG denied having enrolled over 30 students at Strayer.

43.     During the interview, OBONG explained that "James," his friend from Baltimore who attended Morgan State with him, provided OBONG the names he used.  OBONG said that he met "James" through a "tight-knit" group at Morgan State that were providing identities to people.  According to OBONG, "James" gave OBONG a list containing the names, dates of birth, and social security numbers of 13 individuals in approximately 2006 or 2007.  After the interviewing agent recited the names of Victim 1, Victim 3, Victim 4, and Victim 5, and the amount of financial aid refunds that went into OBONG's Bank Mobile account[4], OBONG confirmed that he received four (4) of these names from "James" and he recalled receiving a financial aid refund in Victim 5's name.  When informed he had received $8,408 in refunds in Victim 3's name, OBONG said he

---

[4] The total amount of refunds for four of the Strayer victims that were deposited into OBONG's BankMobile account was approximately $27,543.00.  In addition to these four victims, investigators identified at least one other account OBONG opened at Essex Bank that received fraudulently issued student loan refunds in the names of at least two (2) other real individuals.

thought the amount was accurate.  When asked if he recalled receiving refunds in Victim 1's name, OBONG said, "I think so."  OBONG also admitted he was familiar with Victim 4's name.

44.     During the interview, OBONG stated that he had not seen "James" since 2007 and does not have any of his contact information.  However, OBONG volunteered that after "James" provided these identities to him, he may have come across some "information" online through his own independent research.  When asked how he kept track of the identities, OBONG stated they may be located on his computer.

45.     In response to the question of whether he enrolled any individuals at universities other than Strayer, OBONG initially denied doing so and then asked if the agent had a list.  After the agent answered in the affirmative, OBONG then acknowledged that he may have enrolled one or two individuals at Northcentral University and received financial aid refunds as a result.

46.     When describing how he executed his scheme, OBONG said he used a desktop computer and a laptop computer, which were located in his bedroom, to apply for federal financial aid on behalf of various identities he had obtained.  OBONG provided the password for both computers and said that he was the only one who had access to them.  OBONG noted he typically withdrew funds shortly after receiving financial aid refunds via direct deposit.  OBONG saved some of the money and spent the rest on everyday items such as clothes, shoes, and bill payments.  OBONG also admitted to opening a number of bank accounts with various financial institutions over the years but that the banks have closed many of those accounts, including for overdrafts, and for submitting approximately four or five credit card applications in the names of individuals that "James" provided to him.

<u>CONCLUSION</u>

47.     Based on the foregoing, there is probable cause to believe that beginning in and

around November 2015, defendant UWEM NSE OBONG did knowingly and intentionally commit

wire fraud, in violation of 18 U.S.C. § 1343, in the Eastern District of Virginia and elsewhere.


Michael Major, Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on the _24_ of July, 2019, at Alexandria, Virginia

/s/
Michael S. Nachmanoff
United States Magistrate Judge

MICHAEL S. NACHMANOFF
UNITED STATES MAGISTRATE JUDGE